UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/23/2024
```

------------------------------------------------------------------- X
                                                                    :
MIANKANZE BAMBA                                                     :
                                                                    :
                        Plaintiff,                                  :
                                                                    :        22-cv-7407 (LJL)
            -v-                                                     :        (Lead Case)
                                                                    :
UNITED STATES DEPARTMENT OF HOMELAND                                :
SECURITY, ALEJANDRO MAYORKAS, Secretary of the                     :
Department of Homeland Security,                                    :
                                                                    :
                        Defendants.                                 X
-------------------------------------------------------------------

------------------------------------------------------------------- X
                                                                    :
MIANKANZE BAMBA                                                     :
                                                                    :
                        Plaintiff,                                  :
                                                                    :
            -v-                                                     :        23-cv-8026 (LJL)
                                                                    :
UNITED STATES DEPARTMENT OF HOMELAND                                :
SECURITY, ALEJANDRO MAYORKAS, Secretary of the                     :        OPINION AND ORDER
Department of Homeland Security,                                    :
                                                                    :
                        Defendants.                                 :
                                                                    X
-------------------------------------------------------------------

LEWIS J. LIMAN, United States District Judge:

Plaintiff Miankanze Bamba ("Plaintiff" or "Bamba") brings retaliation claims under Title

VII and 42 U.S.C. § 1981. Defendants the United States Department of Homeland Security

("DHS") and Alexander Mayorkas ("Mayorkas" and with DHS, "Defendants") move, pursuant

to Federal Rule of Civil Procedure 12(b)(1), for an order dismissing the claims of retaliation

under 42 U.S.C. § 1981, and pursuant to Federal Rule of Civil Procedure 56 for summary judgment on the remaining claims.  Dkt. No. 48.[1]

The claim of retaliation under 42 U.S.C. § 1981 is deemed abandoned and the motion to dismiss that claim is granted.[2]  The motion for summary judgment is granted for the following reasons.

## BACKGROUND

The following facts are undisputed unless otherwise stated.

### I.  2008–September 2019: Employment History and Initial Complaints

Plaintiff Miankanze Bamba is an African-American male.  Dkt. No. 1 ("Compl.") ¶ 1.  In September or October 2008, he joined the DHS Federal Protective Service ("FPS") as an employee.  Dkt. No. 67 ¶ 1.  He has remained employed by FPS since that date. *Id.*; Dkt. No. 66-27 ¶ 1.  The official position title on his SF-50[3] at the time he was hired was "Financial Program/Cost Analyst."  Dkt. No. 67 ¶ 4.  Emails from DHS employees in June and July 2008 state that Bamba was interviewing for the position of "FPS New York Financial Manager."  Dkt. Nos. 66-25, 66-26.

When Bamba was hired, he was issued credentials by DHS Immigration and Customs Enforcement with the title "Regional Financial Manager."  Dkt. No. 66-27 ¶ 6; Dkt. No. 66-24.  He was also issued credentials by FPS with the title "Financial Manager."  Dkt. No. 66-23.  He

---

[1] All citations are to the docket in Case No. 22-cv-7407 unless otherwise indicated.

[2] Defendants argue that the Court does not have jurisdiction over Plaintiff's claims for retaliation under Section 1981 because the federal government has not waived its sovereign immunity as to that claim. *See* Dkt. No. 49 at 25 (citing *Nghiem v. U.S. Dep't of Veteran Affairs*, 451 F. Supp. 2d 599, 604 (S.D.N.Y. 2006) (collecting cases), *aff'd*, 323 F. App'x 16 (2d Cir. 2009), *cert. denied*, 558 U.S. 1137 (2010)).  Plaintiff does not respond to that argument.  Accordingly, the claim is deemed abandoned and the motion to dismiss that claim is granted.  *See Jackson v. Federal Exp.*, 766 F.3d 189, 196 (2d Cir. 2014).

[3] SF-50 (Standard Form 50) is a human resources form used by the Federal Government titled "Notification of Personnel Action." *See, e.g.*, Dkt. No. 61-9 at 79.

used the title "Regional Financial Manager" in his email signature.  Dkt. No. 67 ¶ 23; Dkt. No. 66-7.

In May 2018, Bamba applied for a promotion to the position of Program Mission Support Manager.  Compl. ¶ 5.  The position was closed, but he applied again when it was reopened in September 2018.  *Id*. ¶ 9.  In December 2018, he was turned down for that job in favor of YinPing Cheng ("Cheng"), whom he states that he had previously supervised from 2012 to 2016 when Cheng was a Budget Analyst.  Dkt. No. 66-27 ¶¶ 9–13.

Cheng became Bamba's first line supervisor on February 3, 2019.  Dkt. No. 51 ("Cheng Decl.") ¶ 4, Dkt. No. 66-27 ¶ 14.[4]  Bamba protested the choice of Cheng internally, Dkt. No. 66-7, and in February 2019, he filed an EEOC complaint alleging that Chen was wrongfully selected, Dkt. No. 66-27 ¶ 15.  In September 2019, Bamba filed a lawsuit in this Court alleging discrimination on the basis of race, color, and national origin in the selection process.[5]  Dkt. No. 66-27 ¶ 16; *see Bamba v. U.S. Dep't of Homeland Sec.-FPS*, 2021 WL 4478677 (S.D.N.Y. Sept. 30, 2021).

---

[4] Plaintiff concedes that Cheng was his first line supervisor from February 3, 2019 to November 23, 2019, but states that since November 24, 2019 his "first-line supervisor has been Federal Protective Service Directorate of Operation" as indicated in his SF-50.  Dkt. No. 67 ¶ 3.  Plaintiff is correct that this office is listed in his SF-50, Dkt. No. 66-22, but that is a separate issue from his chain of command or supervision.  The Directorate of Operations is an entire division of FPS, and Plaintiff's position being within Operations is consistent with Cheng being his supervisor.  Plaintiff cites to no evidence showing Cheng was not his supervisor at any of the relevant times, and overwhelming direct and circumstantial evidence shows that she was.  Cheng Decl. ¶ 4; Dkt. No. 60 ("Sooter Decl.") ¶ 9; *see, e.g.*, Dkt. No. 66-17 at 5; Dkt. No. 61-21 at 6; Dkt. No. 61-20 at 3.

[5] The lawsuit also concerned a separate incident for which Bamba had filed an EEOC complaint against DHS in 2018.  *See Bamba v. U.S. Dep't of Homeland Sec.-FPS*, No. 19-cv-8646, 2021 WL 4478677, at *2 (S.D.N.Y. Sept. 30, 2021).

**II.        November 2019–October 2020: Change of Title and FFMS Permissions**

Effective November 24, 2019, Bamba's official position title on his SF-50 was changed

from "Financial Program/Cost Analyst" to "Financial Management Specialist."  Dkt. No. 66-22.

This change was approved by Celisa M. Stephens, Executive Director of the Human Resource

Management System, as part of an agency-wide realignment.  Dkt. No. 66-22; Dkt. No. 67 ¶¶ 6,

8.

In January 2020, Bamba began a temporary detail to the National Capital Region to assist

with FPS Region 11 and East Zone matters.  Dkt. No. 66-27 ¶ 18; Cheng Decl. ¶ 7.  While

Bamba was on his detail, Robert D. Sooter ("Sooter"), the Regional Director of FPS Region 2,

realized that Bamba was using the title "Regional Financial Manager" in his email signature.[6]

Dkt. No. 60 ("Sooter Decl.") ¶¶ 1, 7-8.  Regional Financial Manager was not Bamba's title on

any of his SF-50s or in his Position Description.  Dkt. Nos. 61-2; 61-3; 61-8; 61-9.  However, as

noted by Bamba, the title "Regional Financial Manager" appears in several of his narrative

performance evaluations.  Dkt. Nos. 61-2; 66-19.  Sooter believed this was an "unofficial

working title" which created an "inaccurate impression that Mr. Bamba had a supervisory role or

was part of agency management."  Sooter Decl. ¶ 8.  Sooter asked Cheng to look into the issue,

find out Bamba's official title, and direct him to begin using that title.  *Id.* ¶ 9.

On October 20, 2020, upon Bamba's return to Region 2 from his detail, Cheng instructed

Bamba to cease using the working title Regional Financial Manager in official correspondence,

including email, and to begin using the title "Financial Program Cost Analyst."  Dkt. No. 67 ¶

28; Cheng Decl. ¶ 10; Dkt. No. 66-27 ¶ 20.  The email Cheng sent to Bamba upon his return

instructed as follows:

---

[6] Sooter states that "someone" from FPS headquarters brought Bamba's title to his attention and
asked him to address it, but he does not recall who did so.  Sooter Decl. ¶ 8.

> Additionally, in order to ensure clarity, precision, and accuracy of communications, it is important for all of us to use our approved official titles in all official correspondence. As such, I am directing you to only use your correct official title in all emails, memorandums, and other forms of communication. Per your current Position Description and as reflected in your current PWP, your official title is Financial Program Cost Analyst. Therefore, I instruct you to only use that title in any email you send in the course of your official duties for FPS. I note that in the past you have used the title of "Regional Financial Manager." That position no longer exists in FPS. Therefore, I instruct you to immediately cease using it. That is not a position FPS currently has.

Dkt. No. 61-1. Thereafter, Bamba continued to use the title Regional Financial Manager. Dkt. No. 67 ¶ 30.

Bamba experienced another change upon return from his detail in October 2020. Bamba states that since he began working for the agency, he always had approval authority for funding. Dkt. No. 66-27 ¶ 22. After he returned from detail, he was informed that he had the authority to create a financial document but not to approve it, and that Cheng would be the approving official. Cheng Decl. ¶ 6. According to Cheng, upon her entry into the role of Bamba's supervisor in February 2019, she discovered that he had been given the authority to create and approve financial documents without having a supervisor's review or approval; Cheng believed that according to DHS policy and sound financial practices, the same individual who creates a financial document should not also be able to approve it. *Id.* ¶ 6; *see* Dkt. No. 61-17; Dkt. No. 61-15 at 97. [7] Accordingly, she began the process to "correct" the issue. Cheng Decl. ¶ 6. When Bamba returned from his detail he had no approving authority in FFMS. Dkt. No. 61-18.

Bamba states that exercising approval authority was part of his job as a Financial Manager, and disputes that his having this authority was a violation of agency policy. Dkt. No. 66-27 ¶ 22–23; Dkt. No. 67 ¶ 19. An evaluation of Bamba's "FY2018 Accomplishments" by

---

[7] All page numbers for attachments to Dkt. Nos. 61 and 66 use ECF pagination unless otherwise noted.

Regional Director Jason Martinez states that Bamba "served as Funds Approver for the Travel Management Program" and "served as Purchase Card Approver." Dkt. No. 66-19. However, Defendants point out that final approval of funding is not noted as one of Bamba's duties in his Performance Work Plans ("PWPs") for FY2019, FY2020, or FY2021, which include goals such as "[r]ecommend invoices for payment," and "[e]nsure contracting actions are obligated in FFMS." Dkt. No. 61-2 at 9.

On October 26, 2020, Bamba submitted an informal EEO complaint stating that Cheng's and Sooter's actions on return from his detail were retaliation against him for the filing of his previous EEOC claim and lawsuit. Dkt. No. 66-17.

## III.    November 2020–December 2020: Letter of Reprimand and Additional Complaints

On November 6, 2020, Cheng requested that Bamba send her a file for her review before sending it to the Financial Management Division ("FMD"). Dkt. No. 61-20 at 2–8. Rather than sending the file to Cheng, Bamba sent the file directly to FMD that same day without Cheng's review. *Id*.

On December 1, 2020, Cheng issued Bamba a Letter of Reprimand ("LOR") for Bamba's failure to comply with an order, direction, instruction, or assignment of a supervisor. Dkt. No. 61-4. The LOR covered Bamba's failure to provide the file and his continued use of the "Regional Financial Manager" email title:

> On November 6, 2020 at 9:24 a.m., I instructed you by email to provide me the Operational Funding Request File for my review before sending it to Financial Management Division (FMD). You responded to my email at 12:08 p.m. but did not provide the file for my review. You also stated in your email that there was nothing for me to review. I explained to you the importance of receiving the file before it was disseminated and that I needed it by 2:30 p.m. You did not provide me the file I requested, and I later learned you sent it to FMD on the same day without my review contrary to my direct instructions to you. Additionally, On October 20, 2020, I instructed you to immediately cease using the title of "Regional Financial Manager" in your emails. Since that date, you have sent numerous emails

using that title, in direct defiance of my specific instructions.  This behavior from
you will not be tolerated.

Dkt. No. 61-4.  The LOR stated that it would be placed in Bamba's Official Personnel Folder for

two years, that Bamba had the right to submit a statement of disagreement, and that he had the

right to file a grievance or EEO complaint.  *Id.*

Bamba provided a response to the LOR on December 3, 2020.  Dkt. No. 51 ¶ 15.  On the

same day, Bamba submitted a complaint of harassment to the DHS Anti-Harassment Unit,

alleging that he was subjected to a hostile work environment by Cheng.  Dkt. No. 61-23.  In

particular, Bamba stated that Cheng had retaliated against him by changing his role in FFMS,

repeatedly emailing him about the funding report referenced in the letter of reprimand, and

issuing the letter of reprimand.  *Id.*  The Anti-Harassment Unit interviewed Bamba, Sooter, and

Cheng, and eventually issued a fact-finding report on July 28, 2021.  *Id.*

At the time the LOR was issued, Bamba was also in the EEO counseling process related

to the informal complaint he had filed in October.  Dkt. No. 66-17.  The counselor's report lists

Cheng and Sooter under the heading "Counselor's Inquiry" and states that "the Aggrieved

participated in ADR/Mediation," but does not detail conversations with any party besides

Bamba.  *Id.* at 3–4.  The informal process ended on December 17, 2020, and Bamba was given

notice of the right to file a formal complaint.  *Id.* at 37.  On December 29, 2020, Bamba filed a

formal complaint of discrimination with DHS's Office for Civil Rights and Civil Liberties,

complaining of discrimination by Cheng in changing his work role and responsibilities and

issuing the LOR.  Dkt. No. 61-27 at 2.  The formal complaint was pending for the entirety of

2021.  *See id.*

7

**IV.    February 2021–July 2021: The Four-Day Suspension**

The parties dispute the point at which Cheng learned of Bamba's complaints.  Cheng
states that "[she] had heard rumors that Mr. Bamba had filed several complaints against DHS and
FPS officials, but [she] did not know whether these complaints involved Equal Employment
Opportunity ("EEO") activity," and that she first learned of Bamba's EEO complaint in
"February 2021."  Cheng Decl. ¶ 17.  Bamba disputes this, claiming that Cheng had "learned of
Bamba's EEOC activity in 2019 and 2020."  Dkt. No. 67 ¶ 63.  He cites to the October 26, 2020
informal complaint about the changes to Bamba's title and FFMS access, which lists Cheng
under the heading "Counselor's Inquiry" and therefore supports the proposition that the
counselor may have contacted Cheng about that complaint between October 26 and December
17, 2020.  Dkt. No. 66-17.  This complaint does not support Bamba's claim that Cheng learned
about his protected activity in 2019 or at any time prior to removing his FFMS privileges and
title.  According to the DHS Anti-Harassment Unit Report, "Cheng stated that she found out
about the EEO complaint from OGC Attorney Nathaniel Himert on February 2, 2021."  Dkt. No.
61-23 at 6.

On February 3, 2021, Cheng issued Bamba a "Notice of Proposal to Suspend [for] 4
Days," based on Bamba's failure to follow her instructions.  Cheng Decl. ¶ 16; Dkt. No. 61-5.
The Notice contained a single charge: "Failure to comply with an order, direction, instruction or
assignment of a supervisor or other management official."  Dkt. No. 61-5.  That charge was
supported by two specifications.  Specification 1 related to Bamba's use of the title Regional
Financial Manager.  It read as follows:

> **Specification 1**:  On October 20, 2020, I instructed you to immediately cease using
> the title of "Regional Financial Manager" in your emails. December 1, 2020, you
> were reprimanded, amongst other things, for continuing to send out emails with that
> title.  Since both dates, you sent numerous emails using that title, in direct
> contravention of my directions and instructions.

8

Dkt. No. 61-5 at 2–3.  Specification 2 related to Cheng's inability to reach Bamba by telephone.

It read as follows:

> **Specification 2**: On January 11, 2021, I instructed you to take the steps I identified to ensure my phone number was not blocked in your government issued mobile phone and notify me that you complied with those instructions by the end of that day.  You did not comply with my instructions.  To date, you have not notified me that you complied with those instructions.

Dkt. No. 61-5 at 3.  The Notice informed Bamba that the discipline was only a proposal, that he had a right to reply to the charges, and that he had the right to be represented by counsel.  *Id.*

Bamba submitted a response to the suspension proposal on February 16, 2021, through his union representative.  Dkt. No. 61-10.  The response did not deny that Bamba had continued to use the title "Regional Financial Manager" after the reprimand, but it stated that he had now discontinued its use.  *Id.* at 3.  It additionally claimed that Bamba's use of the signature was "justifiable" after Cheng "instructed and demanded he discontinue a signature title he had used for over twelve (12) years," demonstrating "Authoritarian Leadership."  *Id.*  Regarding the phone issue, it stated that Bamba had in fact sent an email to Ms. Cheng responding to her request on January 11, 2021, and that "ethnicity and/or national origin could have contributed to cultural differences in their communication breakdown."  *Id.* at 3.

Sooter, as the Regional Director of FPS Region 2, was responsible for making a decision on the proposal that Bamba be suspended.  Dkt. No. 61-5 at 3.  Sooter reviewed the entire proposal and Bamba's response.  Sooter Decl. ¶ 12.  On March 4, 2021, Sooter issued a decision sustaining the charge and the specifications and suspending Bamba without pay for four days.

Dkt. No. 66-15.  Sooter's decision read in pertinent part as follows:

> In determining the appropriate penalty, I have carefully considered the entire record pertaining to this case.  I find that Ms. Cheng used easily understandable language; her instructions to you were clear, concise and direct; and you failed to follow her direction.  Failure to follow the valid instructions of a supervisor is a serious offense.  In your response you have offered no evidence or argument that indicate

or suggest that you did in fact follow Ms. Cheng's instructions. Instead you appear to attempt to mitigate the seriousness of the allegations arguing that your actions were "justifiable" and that there was a "lack of communication on both parts." However, I find that there is no evidence that shows that your actions were justifiable, nor that Ms. Cheng failed to communication with you in a clear manner. Furthermore, other than your bare assertions, there is no evidence that suggests your ethnicity and/or national origin had any bearing or impact on either your ability to understand Ms. Cheng's instructions or Ms. Cheng's actions in this case. I have concluded, that based upon the facts of the case, which include your December 1, 2020 Letter of Reprimand for similar misconduct, a four (4) day suspension as proposed is an appropriate and reasonable penalty for your conduct in this instance. This action is being taken to promote the efficiency of the service.

*Id.* at 3.

Sooter swears that he came to his decision based solely on the information contained in the proposal, the attached evidence, and Bamba's response. Sooter Decl. ¶ 12. In fact, he states that, at the time, he was not aware of any prior EEO activity or complaints of employment discrimination at FPS made by Bamba. *Id.* ¶ 13. Bamba disputes this, claiming that "Sooter learned of Bamba's EEOC activity in 2020." Dkt. No. 67 ¶ 64. The evidence Bamba cites is the October 26, 2020 informal complaint about the change in title and loss of privileges, which lists Sooter under the heading "Counselor's Inquiry." Dkt. No. 66-17 at 4.

Bamba claims that on July 21, 2021, Cheng changed his SF-50 without authorization. Dkt. No. 66-27 ¶ 28; Compl. ¶ 22; Dkt. No. 67 ¶ 7. SF-50s in evidence from 2021 do not show a change in Bamba's title. Dkt. No. 61-9 at 14–28. Cheng states that she had no authority to change Bamba's job title on his SF-50 and never did so. Cheng Decl. ¶ 13. The only document submitted by Plaintiff dated July 21, 2021 is an updated Position Description, which is signed by Cheng. Dkt. No. 66-14.[8]

---

[8] The only evidence Bamba cites in support of his claim is "Ex. 6," which based on Plaintiff's labeling of exhibits is Dkt. No. 66-22. This is Plaintiff's November 2019 SF-50 showing his position change from "Financial Program/Cost Analyst" to "Financial Management Specialist." *Id.* Plaintiff concedes that the November 2019 change was made by Celisa M. Stephens, the

**V.    2022: The 14-Day Suspension**

On May 5, 2022, the Region 2 Resource Management Branch (also known as the Mission Support Branch) held its weekly staff meeting, led by Cheng, on Microsoft Teams.  Dkt. No. 67 ¶ 41.  The parties dispute what happened during the meeting.  It is not disputed that Bamba stated that the return-to-office requirements were contrary to policy and several times stated that he could not hear Cheng and was having computer issues.  *Id.* ¶¶ 43-44.  Defendants claim that Bamba repeatedly interrupted Cheng and that Cheng had to instruct Bamba to stop talking at which point he stated, "this is workplace harassment" or words to that effect.  *Id.* ¶¶ 42, 45.  Plaintiff contends that his device malfunctioned during the course of the meeting, he did not disrupt the meeting and he did not hear Cheng say to stop talking.  *Id.* ¶¶ 42, 45.  Defendants state that Bamba's interruptions continued until Cheng informed the group that she would begin to record the meeting and then began to record the meeting.  *Id.* ¶¶ 46-47.  Plaintiff states that he never heard Cheng state that she would begin to record the meeting and that she never recorded the meeting.  *Id.* ¶¶ 46–47.  Defendants' version is supported by declarations of six FPS employees in attendance at the meeting.  Dkt. Nos. 52, 54, 56, 57, 58, 59.

Following the meeting, Cheng reached out for advice to Employee and Labor Relationship Specialist William Beckham, a DHS contractor supporting FPS.  Dkt. No. 67 ¶ 48; Dkt. No. 53 ("Beckham Decl.") ¶ 4.  Defendants state that she did so for assistance in light of the fact that Bamba had a disciplinary history and his conduct occurred in front of the entire Resource Management Branch staff; Plaintiff responds that Cheng's motives were retaliatory.  Dkt. No. 67 ¶ 48.  Over the next several weeks, Beckham provided feedback, input, and guidance to Cheng regarding what disciplinary action to take, if any.  *Id.* ¶ 49; Beckham Decl. ¶ 4.  In

---

Executive Director of the Human Resource Management System.  Dkt. No. 67 ¶ 8.  Plaintiff does not cite to any SF-50s from 2021 which support his claim.

doing so, he obtained statements from the other employees at the meeting regarding Bamba's conduct.  Beckham Decl. ¶ 4.  Cheng ultimately decided to propose a 14-day suspension for Bamba's conduct; Beckham agreed with this decision.  *Id.* ¶ 5.

On June 2, 2022, DHS issued a Final Agency Decision on Bamba's formal EEO complaint, which had been pending since December 2020.  Dkt. No. 61-27.  The Final Agency Decision found that Bamba "failed to prove that FPS discriminated against complainant," and informed him of his right to appeal to the EEOC or file a civil action.  *Id.* at 8–9.

On June 3, 2022, Cheng issued Bamba a "Notice of Proposed 14-Day Suspension."  Dkt. No. 61-6.  The Notice contained a single charge and single specification:

## II.    CHARGE AND SPECIFICATION

### CHARGE: RUDE, DISRUPTIVE, AND DISRESPECTFUL CONDUCT.

Specification:  On May 5, 2022, I held the weekly Resource Management Branch (RMB) staff meeting via Microsoft Teams, which you and other members of RMB attended.  I was going through the agenda items and briefing staff concerning the work time recording requirements and reiterating the core hours.  As I did this, you repeatedly, rudely, and loudly interrupted the meeting multiple times, even after I informed you that we needed to move on, and that you should address your specific concerns to me later by email. Despite this instruction, you continued to disrupt the meeting, so I instructed you to stop talking by saying, "Miankanze, you have to stop talking." However, you continued to interrupt me loudly and rudely.  Your conduct was rude, disruptive, and disrespectful.

Dkt. No. 61-6 at 4–5.

The Notice recites that in deciding to recommend a 14-day suspension as a penalty, Cheng considered: (1) the nature and seriousness of Plaintiff's offense; (2) his job level and type of employment; (3) his past disciplinary record, including the prior 4-day suspension and prior Letter of Reprimand; (4) that Plaintiff's rude and disrespectful behavior gave Cheng little confidence that he could perform his duties in a professional manner; (5) the consistency of the proposed penalty with those imposed on other employees; (6) the consistency of the proposed

penalty with the Agency's Table of Penalties; (7) the clarity with which Plaintiff was put on notice that he was violating the rules including that he persisted in engaging in unprofessional behavior even after receiving a warning; (8) his low rehabilitative potential; and (9) that the prior Letter of Reprimand and short suspension had been insufficient to deter his violative conduct. *Id.* at 5–6.

The Notice attached minutes from the May 5 meeting. *Id.* at 15–18. The minutes reflect that, after Cheng explained the return to work policy, Bamba stated that the Region was violating federal policy and that Cheng asked Bamba to send her an email with his specific concerns so that they could discuss them off-line and move to the next topic. The minutes further reflect that Bamba then interrupted Cheng and the meeting and again asked for what Cheng was saying in writing. Bamba stated that his computer was not working and that he had been working off his cellphone and that Cheng was engaged in "pure harassment." Cheng then asked Bamba to reiterate what he said but Bamba responded that he was not able to hear. At that point, Cheng asked for permission to record the meeting. *Id.* at 16–17.

The Notice also attached statements from the employees who attended the May 5, 2022 RMB staff meeting. The attendees reported that Bamba "consistently interrupted the meeting providing incomprehensible words," "created a hostile and toxic environment inconducive to productivity" and engaged in "insubordination," *id.* at 20; that he "interrupted the meeting several times with the same issue," "yelling and interrupting Chief Cheng to a degree that made [the employee] uncomfortable just listening to it," and acted in "an unprofessional and disrespectful way toward Chief Cheng," *id.* at 23; that he "continued to interrupt the Chief multiple times even after she stated that we needed to move on and he could address his concerns by email," *id.* at 27; that Cheng "trie[d] to calm [Bamba] down but it is not easy" and Bamba's

conduct was "disrespectful toward us," *id.* 32; that Bamba "was speaking over Chief Cheng," *id.* at 38; that after Bamba "took issue with" what Cheng was saying they engaged in a "somewhat lengthy exchange" that "continued and escalated," *id.* at 42; and that "Bamba kept talking expressing his frustration because apparently, he could not hear the conversation happening in our TEAMS call," but after the meeting was recorded Bamba no longer "mentioned anything about having problems with sound," *id.* at 52–53.

Scott J. McCormick, Deputy Regional Director of the Northeast and Caribbean Region, was responsible for making a decision on the recommendation for a suspension. *Id.* at 7. On June 13, 2022, Bamba, through counsel, submitted to McCormick a written response to the notice of the proposed 14-day suspension. Dkt. No. 61-12. Bamba claimed that his conduct was not "abusive, defamatory, malicious, or similarly inappropriate" and that he "was having laptop problems as he asked a question about DHS's new return policy." *Id.* at 3. He argued that the events of May 5, 2022 represented "an amalgam of a genuine inquiry and laptop technical difficulties," for which a suspension of 14 days was inappropriate. *Id.* Counsel also noted that Bamba had a case in federal court involving Cheng and that Bamba's personnel file "was remarkable prior to Mr. Bamba commencing his suit in federal court." *Id.* at 4.

Before making a decision, McCormick consulted Beckham regarding Bamba's response, and Beckham helped McCormick memorialize his decision. Beckham Decl. ¶ 6. Beckham and McCormick agreed that the evidence supported the charged misconduct and that Bamba should be suspended for 14 days. *Id.*

On June 27, 2022, McCormick issued a decision on the notice of proposed 14-day suspension. Dkt. No. 61-13. The decision noted that Plaintiff was represented by counsel. *Id.* at

3.  McCormick concluded that the charge and specification were supported by the preponderance

of the evidence.  He wrote:

> An agency is entitled to expect its employees to conform to certain accepted
> standards of civil behavior and decorum.  Your rude, disruptive, and disrespectful
> conduct as manifested in your behavior in the RMB staff meeting on May 5, 2022,
> was unacceptable and not conducive to a stable working atmosphere.  Making the
> offense even more serious is that you engaged in this behavior in front of your
> fellow co-workers.  Your rude and disrespectful behavior toward Ms. Cheng as
> your supervisor seriously undermines her capacity as a management official to
> maintain employee efficiency and discipline, and I cannot be expected to exercise
> forbearance of such conduct.  You repeatedly, rudely, and loudly interrupted Ms.
> Cheng multiple times during the meeting, even after she informed you that the
> meeting needed to move on, and that you should address your specific concerns to
> her later by email.  Instead of heeding Ms. Cheng's instructions, you continued to
> disrupt the meeting and would not follow her directions that you cease talking.
> Your conduct was also disrespectful towards your colleagues who were simply
> attending the meeting, but instead had to listen to and witness your persistent
> interruptions and rude behavior.  You not only wasted Ms. Cheng's time with your
> actions, but you also wasted the time of your colleagues as well.  Your conduct was
> so disrespectful towards Ms. Cheng and your colleagues that co-workers were text
> messaging each other during the meeting to express their concerns about your
> behavior.  In the end, there is no question that your conduct was rude, disruptive,
> and disrespectful towards Ms. Cheng as your supervisor and your work colleagues.
> These are aggravating factors.

*Id.* at 5.

McCormick concluded that the decision "[was] warranted and the penalty [was] within

the bounds of reasonableness and, if effected, [would] promote the efficiency of the service."  *Id.*

at 7.  McCormick swears that he "came to [his] decision [to suspend Bamba] based only on the

information contained in the proposal, the attached evidence, and Mr. Bamba's response and

exhibits" and "after receiving feedback, input and guidance from Beckham," the Employee and

Labor Relations Specialist contracted to DHS "who assisted [him] to ensure that [the] decision to

suspend Mr. Bamba was in accordance with agency policy and procedure."  Dkt. No. 55 ¶ 7.

McCormick further declares that at the time he suspended Bamba he was not aware of "any prior

EEO activity, complaints of employment discrimination, or Anti-Harassment Unit complaints at

FPS made by [Bamba]" and therefore did not consider any prior EEO complaints or activity or any other complaints of employment discrimination. *Id.* ¶ 9. There is no evidence to the contrary.[9]

## PROCEDURAL HISTORY

Plaintiff has filed three complaints in this Court regarding his treatment by DHS.

As mentioned above, Plaintiff filed a complaint pro se on September 17, 2019 alleging discrimination on the basis of sex, race and national origin in the promotion of Cheng over him, the creation of a hostile work environment, and harassment by a co-employee, all in violation of Title VII of the Civil Rights Act of 1964, and employer negligence in violation of the Federal Tort Claims Act, 28 U.S.C. § 2674. *See* Dkt. No. 1., *Bamba v. U.S. Dep't of Homeland Sec.-FPS* (*Bamba I*), 2021 WL 4478677 (S.D.N.Y. Sept. 30, 2021) (No. 19-cv-8646). Plaintiff filed an amended complaint in that action on January 14, 2020. Dkt. No. 7, *Bamba I*, No. 19-cv-8646.[10] On February 3, 2021, acting through counsel, Plaintiff filed a second amended complaint. Dkt. No. 28. The Magistrate Judge, to whom the matter was referred for report and recommendation, Dkt. No. 4, recommended that the second amended complaint be dismissed in its entirety, but that Plaintiff be permitted to replead his claims for hostile work environment, Dkt. No. 45. The Court adopted the Magistrate Judge's report and recommendation in part; it permitted Plaintiff to replead his Title VII hostile work environment claim and denied Defendants' motion to dismiss Plaintiff's Title VII non-selection claim, but otherwise adopted the Magistrate Judge's recommendations of dismissal. Dkt. No. 49. After discovery, the Magistrate Judge

---

[9] Bamba asserts that McCormick was aware of the criminal investigation in "the James Ward case," Dkt. No. 67 ¶ 15. "[T]he James Ward case" may reference Bamba's lawsuit filed in September 2019, *see* Dkt. No. 56 ¶ 14–35, No. 19-cv-8626, but Bamba does not support his assertion with admissible evidence that McCormick was aware of the lawsuit or of the criminal investigation related to that case.

[10] All docket citations in this paragraph refer to the docket in *Bamba I*, No. 19-cv-8646.

recommended that summary judgment be granted for Defendants on the remaining claims.  Dkt. No. 93.  The Court adopted the Magistrate Judge's report and recommendation, overruled Plaintiff's objections to that report, and granted Defendants summary judgment on all of Plaintiff's claims.  Dkt. No. 99.   Plaintiff has appealed the Court's judgment in that case to the Second Circuit.

Plaintiff filed his first complaint in these consolidated actions on August 30, 2022, claiming retaliation under Title VII and 42 U.S.C. § 1981.  Dkt. No. 1, No. 22-cv-7407.  He alleged that after he filed the lawsuit against DHS challenging the selection of Cheng and after he returned from his detail in Washington, DC, Cheng changed Plaintiff's access to the financial systems, ordered Plaintiff to change his job title, and issued the letter of reprimand.  *Id.* ¶¶ 13– 18.  Plaintiff further alleged that after he filed the December 2020 EEO complaint, Cheng and DHS suspended him for three days without pay.  *Id.* ¶¶ 19–20.[11]  Finally, Plaintiff alleged that after he contacted the DHS Anti-Harassment Unit in June 2021,[12] Cheng unilaterally changed his SF-50 job title and classification without authorization.  *Id.* ¶¶ 21-22.  Discovery was completed on August 18, 2023.  Dkt. No. 21.  Defendants were scheduled to file their motion for summary judgment on October 25, 2023.  Dkt. No. 23.

On September 11, 2023, after discovery had been completed in 22-cv-7407 but before motions were due, Plaintiff filed the second of the two lawsuits in this consolidated matter.  Dkt. No. 1, 23-cv-8026.  Plaintiff complained that the 14-day suspension issued June 27, 2022

---

[11] Plaintiff alleges that he was suspended for three days.  From context, it is apparent that he is referring to the four-day suspension.
[12] There is no evidence in the record of an AHU complaint in June 2021.  There is an AHU report issued in July 2021 regarding a complaint filed in December 2020.  Dkt. No. 61-23.

constituted retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. *Id.* ¶¶ 7–9, 11–20.

On January 17, 2024, the Court entered an order consolidating the two actions, 22-cv-7407 and 23-cv-8026, for all purposes pursuant to Federal Rule of Civil Procedure 42(a). Dkt. No. 5. The Court extended the discovery deadline for matters distinctive to the second filed action to February 29, 2024. Dkt. No. 6. That deadline was extended for the deposition of Cheng. Dkt. No. 10.

On April 9, 2024, Defendants filed this motion for summary judgment. Dkt. No. 48. Defendants also filed a memorandum of law, a Rule 56.1 statement, and eleven declarations (including that of counsel attaching exhibits). Dkt. Nos. 49–61.[13] After he was granted an extension of time, Plaintiff filed a memorandum of law in opposition to the motion on June 10, 2024. Dkt. No. 66. Plaintiff also filed a counterstatement to the Rule 56.1 statement and a set of 27 exhibits. Dkt. Nos. 66–67. Defendants filed a reply memorandum of law on an extended date of July 1, 2024. Dkt. No. 70.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable

---

[13] On April 15, 2024, the Court denied Plaintiff's motion to strike the motion for summary judgment as untimely. Dkt. No. 63.

jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate." *Am. Home Assurance Co. v. Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137.

Local Rule 56.1 of the Local Rules for the Southern District prescribes the manner and method in which a party is to present undisputed issues of fact to the Court.  The moving party must annex to its notice of motion "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Rule 56.1(a).  The party opposing the motion for summary judgment is required to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."  Local Rule 56.1(b).[14]  The statements "must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Local Rule 56.1(d).  The consequences of failure to follow these rules can be severe.

---

[14] Local Rule 56.1 was amended effective July 1, 2024, after all Rule 56.1 statements were submitted in this action.  The wording of Local Rule 56.1 set forth here is the wording at the time the statements were submitted, which differs slightly from the wording of the current rule.

"Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Rule 56.1(c).

Thus, a Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record."  *Holtz*, 258 F.3d at 74.  If portions of a Rule 56.1 counterstatement cite to no admissible evidence in support of its denials, the Court is instructed to disregard those portions and deem the factual statements in the original Rule 56.1 statements admitted.  *See, e.g.*, *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (holding that denials that are not supported by citations to admissible record evidence are to be disregarded).  When the non-moving party in certain instances fails to cite to any record evidence for its denials, the Court accepts the moving party's characterization of those facts in its 56.1 statement as undisputed.  *See Colton v. N.Y. Div. of State Pol.*, 2017 WL 5508911, at *2 (N.D.N.Y. Feb. 8, 2017) ("The failure to properly controvert a supported statement of fact by pointing to admissible evidence contravening the movant's evidence results in the movant's statement being deemed admitted."); *Knight v. N.Y.C. Hous. Auth.*, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007) ("Pursuant to Local Civil Rule 56.1 Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record.").

## II.    Title VII Retaliation

Title VII prohibits an employer from "discriminat[ing] against" an employee "because he has . . . opposed any practice" made unlawful by Title VII "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).

"Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp*, 420 F.3d 166, 173 (2d Cir.2005). "To make out a prima facie case of retaliation, a plaintiff must demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)). "The plaintiff's burden in this regard is 'de minimis,' and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *Hicks*, 593 F.3d at 164 (quoting *Jute*, 420 F.3d at 173).

A complaint of discrimination constitutes protected activity if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable. *See Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998).

The "knowledge" element is established at the prima facie stage if there is "general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).

"An action qualifies as 'materially adverse' if it is 'harmful to the point that [it] *could well dissuade a reasonable worker from making or supporting a charge of discrimination*.'" *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 239 (2d Cir. 2024) (emphasis in original) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006)). "[T]he antiretaliation provision applies to 'employer actions that would have been materially adverse to

a reasonable employee,'" regardless of whether the action itself was "workplace-related or employment-related." *Id.* (quoting *Burlington*, 548 U.S. at 57); *see Hicks*, 593 F.3d at 169. "The test of whether a decision is a materially adverse employment decision is whether its nature is such that it would likely, in the relevant context, dissuade a reasonable employee from complaining about discrimination." *Moll*, 94 F.4th at 244. Thus, "[m]aterial adversity is to be determined objectively, based on the reactions of a reasonable employee." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 69–70). In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation must be considered "both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." *Hicks*, 593 F.3d at 165 (internal quotations omitted); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 92 (2d Cir. 2015) ("Some of these actions, considered individually, might not amount to much. Taken together, however, they plausibly paint a mosaic of retaliation and an intent to punish [plaintiff] for complaining of discrimination.").

Finally, as to causation, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . requir[ing] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tx. Sw. Med. Cntr. v. Nassar*, 570 U.S. 338, 360 (2013). "Causation can be established either directly through evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity or through other evidence such as disparate treatment of fellow employees." *Massaro v. N.Y. City Dep't of Educ.*, 2022 WL 1788203, at *2 (2d Cir. June 2, 2022), *cert. denied*, 143 S. Ct. 372

(2022). Either way, the plaintiff must ultimately "establish that . . . her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362.

When a prima facie showing of retaliation is made, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant proffers such a reason, "the presumption raised by the *prima facie* case is rebutted and drops from the case." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (internal quotation marks omitted). The plaintiff then bears the ultimate burden to show that the employer's proffered reason was merely a pretext for an unlawful motive. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). "[T]he employee's admissible evidence must show 'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Kirkland v. Cablevision Sys.,* 760 F.3d 223, 225 (2d Cir. 2014) (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 835 (2d Cir.2013)). "A plaintiff may carry this burden by reference to the same evidence used to establish a prima facie case, provided that the evidence admits plausible inferences of pretext." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88–89 (2d Cir. 2019).

## DISCUSSION

Plaintiff alleges that FPS, and Cheng in particular, took the following adverse actions against him in retaliation for his participation in protected activity: (1) changing his access to FFMS in October 2020, Compl. ¶ 15; (2) ordering Plaintiff to change his job title in October 2020, Dkt. No. 66-27 ¶ 20;[15] (3) issuing the LOR in December 2020, Compl. ¶ 18; (4)

---

[15] Although the complaint references this occurring in December 2020, Compl. ¶ 17, the evidence is clear that it occurred in October 2020, and Bamba provides this date in his declaration submitted in opposition to summary judgment, Dkt. No. 61-1; Dkt. No. 66-27 ¶ 20.

suspending Plaintiff for four days without pay in March 2021, *id.* ¶ 20;[16] Dkt. No. 61-11 at 3; (5)

unilaterally changing Plaintiff's SF-50 job classification without authorization on July 21, 2021,

Compl. ¶ 22; and (6) suspending Plaintiff for 14 days in June 2022, Dkt. No. 1 ¶ 9, No. 23-cv-

8026.

      Defendants argue that Bamba has failed to establish a prima facie case of retaliation

regarding any of these actions, either because the actions are not materially adverse or because

there is insufficient evidence demonstrating causation.  Dkt. No. 49 at 19–22.

## I.    Prima Facie Case

      Plaintiff does not dispute that Bamba has engaged in protected activity or that DHS was

aware of this activity.  *See* Dkt. 49.  The parties dispute whether certain actions taken by DHS

are materially adverse and whether the evidence regarding any action can support a finding of

causation.  Dkt. No. 49 at 19–22; Dkt. No. 66 at 11–13; Dkt. No. 70 at 2–6.

### A.    Protected Activity

      The retaliation provision of Title VII protects employees who have "opposed any practice

made an unlawful employment practice by this subchapter," or "made a charge . . . or

participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42

U.S.C. § 2000e-3(a).  A complaint is protected activity if the employee "had a good faith,

reasonable belief that [she] was opposing an employment practice made unlawful by Title VII."

*Kelly*, 716 F.3d at 14 (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir.

2001)).  Bamba filed an EEO complaint in February 2019 and subsequent lawsuit in September

2019 that claimed discrimination in violation of Title VII related to the selection of Cheng, Dkt.

---

[16] Plaintiff states in the complaint that he was suspended for three days without pay in April 2021.  Compl. ¶ 20.  The undisputed facts establish that the suspension was for four days and occurred in March 2021.  Dkt. 61-11 at 3.

No. 66-27 ¶¶ 15–16; Dkt. No. 66-11; an informal complaint in October 2020 alleging that Cheng and Sooter retaliated against him in violation of Title VII and a related formal complaint in December 2020, Dkt. Nos. 66-17, 66-18; and a complaint with the Anti-Harassment in December 2020 alleging Cheng harassed and retaliated against him for filing the previous complaints, Dkt. No. 61–23.  Each of these complaints opposes either discrimination in selection (February 2019 complaint, September 2019 lawsuit) or retaliation for complaining of such discrimination (October 2020 and December 2020 complaints), which are unlawful employment practices under Title VII.  *See* 42 U.S.C. §§ 2000e-2(a), 2000e-3(a).  Defendants do not contest that Plaintiff's complaints and lawsuits were based on a good faith, reasonable belief that an unlawful practice had occurred.  Therefore, Plaintiff has proffered evidence that he engaged in protected activity.  *See Cook v. CBS, Inc*., 47 F. App'x 594, 596 & n.1 (2d Cir. 2002) (filing of Title VII lawsuit constituted protected activity); *Kwan* 737 F.3d at 844 (informal, internal complaint of gender discrimination constituted protected activity).

Defendants imply in passing that the October 2020 complaint may not be protected because it is informal.  Dkt. No. 70 at 5.  However, "protected activity includes informal protests of discriminatory employment practices, including making complaints to management," so long as these complaints are "sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII."  *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (internal quotation marks and citations omitted).  Plaintiff's informal complaint specifically referenced his previous EEO claim and stated that Cheng "has operated in a malicious and unprofessional manner with the intent to retaliate against me for my filing my claim, a protected activity under federal law."  Dkt. No. 66-17 at 9.  It could hardly be clearer

that Plaintiff is complaining about prohibited retaliation under Title VII.  The informal complaint is protected.

### B.    Knowledge

The knowledge element of a retaliation claim requires only "general corporate knowledge that the plaintiff has engaged in a protected activity."  *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000).  Knowledge of protected activity by an officer of a corporation is "sufficient to impute to [the corporation] general corporate knowledge of the plaintiff's protected activity."  *Kwan*, 737 F.3d at 844.  Each of Plaintiff's internal complaints was made directly to an officer at DHS, and DHS appeared in and defendant Plaintiff's 2020 lawsuit.  DHS had knowledge of the protected activity.

### C.    Adverse Action

Defendants do not dispute that the LOR and suspensions are materially adverse actions.[17] However, Defendants argue that changes to title usage, FFMS access, and SF-50 were not

---

[17] An oral reprimand has been held not to be materially adverse.  *See Tepperwien*, 663 F3d at 570 ("[C]riticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action.") (quoting *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001)).  However, "a formal reprimand issued by an employer is not a 'petty slight,' 'minor annoyance,' or 'trivial' punishment; it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy."  *Millea v. Metro-North R.R. Co*., 658 F.3d 154, 165 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 68).

Here, the LOR had numerous indicia of formality that suggest it is "a formal reprimand" rather than mere "criticism."  The LOR did not offer constructive advice.  It was labeled an "official reprimand" and was issued not to give Plaintiff guidance on how to execute his employment responsibilities but to document his "failure to comply with an order, direction, instruction or assignment of a supervisor or other management official."  Dkt. No. 61-4.  The LOR was placed in Plaintiff's employment files and he was given not just an opportunity to respond but formal grievance rights.  *Id.*  The LOR is part of a progressive disciplinary scale and has the consequence of exposing the employee to future punishments. Plaintiff's later four-day and 14-day suspensions explicitly reference the LOR as part of Plaintiff's disciplinary history and a reason for greater punishment.  Dkt. No. 61-11 at 3; Dkt. No. 61-13 at 6.

materially adverse because they "did not change Bamba's duties, responsibilities, compensation, or grade," nor did they alter his "official position."  Dkt. No. 49 at 19–20.  Plaintiff responds that these actions changed "his job title" and "prevented [him] from performing his job function."  Dkt. No. 66 at 11–12.  The debate between the parties centers around whether Plaintiff's job is defined by official records or historical practice.

### 1.    October 2020 Actions: Job Title and FFMS Access

The changes related to Bamba's title usage and FFMS access both occurred in October 2020, at the time of his return from detail.  Both changes involved preventing Bamba from taking actions or using privileges that he states had long been allowed, but which the Defendants state were contrary to his job description or policy.  Therefore, these changes are appropriately considered together.  *See Hicks*, 593 F.3d at 166 ("[I]n determining whether conduct amounts to adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate.").

In October 2020, Cheng directed Bamba to stop using the title "Regional Financial Manager" and begin using the title "Financial Program Cost Analyst" in his email signature.  Dkt. No. 61-1.  Cheng stated that Financial Program Cost Analyst was the title in Bamba's Position Description, and DHS has provided two position descriptions that reflect this.  *Id.*; Dkt. Nos. 61-3, 61-8.[18]  However, Bamba states that in practice, "[f]rom October 2008 to October 20, 2020, [he] was held out throughout DHS FPS and the US Government as a Regional Financial Manager."  Dkt. No. 66-27 ¶ 8.  Documentary evidence shows that at the time of his interview in

---

[18] As noted by Bamba, however, it is undisputed that in 2019 the title on Bamba's SF-50 had been changed to Financial Management Specialist.  Dkt. No. 67 ¶ 6.  Bamba therefore argues that Cheng "falsely and incorrectly believed" his correct title was Financial Program Cost Analyst, Dkt. No. 66 at 14.  The apparent discrepancy between the SF-50 and Position Description in October 2020 has not been explained.

2008 his position was referred to as "Financial Manager," Dkt. Nos. 66-25, 66-26, that he was issued credentials with the titles "Financial Manager" and "Regional Financial Manager," Dkt. Nos. 66-23, 66-24, and that a performance evaluation as recently as FY2018 used the title "Regional Financial Manager," Dkt. Nos. 61-2, 66-19. The evidence shows that "Regional Financial Manager" was not Bamba's official title on certain paperwork, but also demonstrates that it was his working title or a title he was permitted to use to at least to some extent before October 2020.

Also in October 2020, Cheng took away Bamba's approving authority in FFMS. Dkt. No. 61-18. As with the title, Defendants again note that approval authority was not part of Plaintiff's official "PWP or Position Description." Dkt. No. 70 at 2–3, citing Dkt. No. 66-19. In addition, documentary evidence shows that granting Bamba the "Approver" role in FFMS along with the other roles he requested would create a "conflict between user role," which is a "Segregation of Duties violation," i.e. a violation of agency policy. Dkt. No. 61-17; *see* Dkt. No. 61-18. As with the title, Plaintiff declares that "approv[ing] funding" is something he "had been doing since [he] began working for the Agency." Dkt. No. 66-27 ¶ 22. His FY2018 performance evaluation supports this claim by stating that he was a "Funds Approver for the Travel Management Program" and "Purchase Card Approver." Dkt. No. 66-19. The evidence shows that allowing Bamba approval authority along with his other FFMS roles would violate DHS policy, but also that Bamba nevertheless had and used such authority to some extent prior to October 2020.

Viewing the FFMS and title issues together, Plaintiff's argument is that he was functionally demoted. Prior to October 2020 he had a managerial title and at least one managerial privilege; in October 2020 he lost his managerial privilege and title. A transfer to a

29

lower position is an adverse action. *See e.g., Brady v. Wal-Mart Stores, Inc*., 531 F.3d 127, 134 (2d Cir. 2008) (transfer to a position with "less prestigious title" and "diminished material responsibilities constituted an adverse action); *see also Lore*, 670 F.3d at 171 (collecting cases). A "manager" title is generally viewed as more prestigious than a nonmanagerial title, and movement from a managerial to nonmanagerial role normally would be considered a demotion. *See, e.g.*, *New York City Managerial Emps. Ass'n v. Dinkins*, 807 F. Supp. 958, 969–70 (S.D.N.Y. 1992) (noting differences between managerial and nonmanagerial employees and describing them as "higher and lower-ranking"); *Petrosino v. Bell Atl*., 385 F.3d 210, 226–29 (2d Cir. 2004) (discussing movement from a "technician" to "manager" position as "promotion"). Even if the Plaintiff's position did not actually change, a reassignment of duties within a position may be an adverse action if the former duties are "more prestigious" and "objectively considered a better job." *Burlington*, 548 U.S. at 71; *see Beyer v. Cnty. of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008) ("[A]dverse employment action can exist when an employee's new assignment is 'materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement.'") (quoting *Galabya v. N. Y. City Bd. of Educ*., 202 F.3d 636, 641 (2d Cir. 2000)); *Wright v. N.Y. City Off–Track Betting Corp*., 2008 WL 762196, at * 4 (S.D.N.Y. Mar. 24, 2008) ("Comparatively poor assignments can constitute adverse employment actions.").

To clarify the issue, assume that Plaintiff was in fact hired as a "Financial Manager" or "Regional Financial Manager," with responsibilities that included giving final approval for travel funds and use of the purchase card. On return from his detail in 2020, he was given the new title, "Financial Program Cost Analyst," and rather than approving relevant funds himself he was forced to go through a manager for approval. A reasonable employee would view this as adverse

action, because it involves "a less distinguished title," combined with "diminished material responsibilities." *Brady*, 531 F.3d at 134 (2d Cir. 2008); *see Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003) ("[W]ithdrawing an employee's supervisory duties constitutes an adverse employment action."). It thus is sufficient to satisfy the third prong of the prima facie test.

Defendants press the point that Plaintiff was not actually demoted. Dkt. No. 49 at 19–20. According to Defendants, Plaintiff's managerial title "did not exist," and his FFMS approval access was against agency policy and outside of his job description. *Id.* Defendants therefore argue that even if a demotion of the type Bamba describes would be adverse, that is not what happened here.

Defendants' showing regarding official policy and duties informs, but does not resolve, the question of whether a reasonable employee would perceive these actions as a material demotion "in the circumstances of the particular case." *Burlington*, 548 U.S. at 71. The *Burlington* standard focuses on the practical effect of an action and its tendency to deter, not on formalities. *See Id.* at 70 (rejecting the argument that the employee's reassignment could not be adverse because "both the former and present duties fall within the same job description"); *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 208 (2d Cir. 2006) ("[T]he means by which an employer can retaliate against an employee are not limited to altering his compensation, terms, conditions, or privileges of employment."); *see also Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174–175 (2011) ("Given the broad statutory text and the variety of workplace contexts in which retaliation may occur, Title VII's antiretaliation provision is simply not reducible to a comprehensive set of clear rules."). The focus on function rather than form is in keeping with the idea that the adverse action concept should be broad enough to "deter the many forms that effective retaliation can take," achieving the "antiretaliation provision's purpose

of "[m]aintaining unfettered access to statutory remedial mechanisms." *Id.* at 54 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).[19]

Construing the evidence "in the light most favorable to the non-moving party," the loss of Bamba's title and duties could be materially adverse under these circumstances even if his title and duties were unofficial. *Holcomb*, 521 F.3d at 132. Defendants have not disputed that Plaintiff used a managerial title and had approval duties from 2008 to 2020. Plaintiff was issued official credentials with managerial titles, Dkt. Nos. 66-23, 66-24, and evaluations from the time shortly before he went on his detail (FY2018) use the "Regional Financial Manager" title and discuss his approval duties. Dkt. Nos. 61-2, 66-19. Construed most favorably to Bamba, this evidence shows that he was generally allowed to use a managerial title and approve funding as a manager would, and the SF-50s and Position Description were unimportant paperwork. If a reasonable employee in Plaintiff's situation would have perceived "Regional Financial Manager" as "his" title and approving funding as "his job function" prior to October 2020, a reasonable employee also would perceive the loss of this title and function to be a materially adverse action involving "a less distinguished title," combined with "diminished material responsibilities." *Brady*, 531 F.3d at 134 (2d Cir. 2008). It may be that this construal of the facts is inaccurate, and

---

[19] By contrast, a plaintiff bringing a case for employment discrimination under Title VII must show a "some harm respecting an identifiable term or condition of employment," but need not show that this harm was "serious," "substantial" or "materially adverse." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355–357 (2024). This difference is logical given the purpose of each statutory provision. The anti-discrimination provision "'seeks a workplace where individuals are not discriminated against' because of traits like race and sex." *Id.* at 357–58 (quoting *Burlington*, 548 U.S. at 63). It therefore outlaws all such discrimination in the workplace, even if the harm is minor. *Id.* The anti-retaliation provision seeks to prevent employer actions which would "deter Title VII enforcement." *Id.* It therefore punishes any harm that "causes significant enough harm to deter" employee complaints, regardless of where it occurs. *Id.* The retaliation provision does not aim to prevent only certain types of retaliation, but generally to prevent retaliation that would interfere with statutory enforcement.

that the formal description of Plaintiff's title, role, and responsibilities in the SF-50s and Position Description would reflect a reasonable employee's understanding of his role. However, "context matters," and Defendants have not shown at this stage that within the context of this office the official position descriptions had such force that a reasonable employee could not understand the removal of unofficial privileges as an adverse action. *Burlington*, 548 U.S. at 69.

Thus, while an employee's official job title and official job responsibilities are relevant to the further question of whether the employer's action confining the employee to that title and those responsibilities is based on legitimate, non-discriminatory and non-retaliatory reasons, it is not dispositive whether such action is materially adverse in the context of the prima facie case. *Cf. Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) (holding that when "an employee's alleged or admitted misconduct is . . . inextricably intertwined with the employer's legitimate, non-discriminatory reason for the employee's termination," "it is inappropriate to evaluate the employee's misconduct in the context of the prima facie case"). Plaintiff suggests his job is what he has practically done or been allowed to do, which changed in October 2020. Defendants suggest it is his official role and position description, which did not change, and that no reasonable employee could have an expectation that he would be permitted to continue to use the title "manager" and continue with his approval authority. *See Robinson v. De Niro*, 2023 WL 4862772, at *35 (S.D.N.Y. May 25, 2023). On Defendants' motion for summary judgment, the Court construes the facts in the light most favorably to Plaintiff. *Holcomb*, 521 F.3d at 132. In this light, the change to Bamba's title and privileges qualifies as materially adverse. Defendants' argument that the government had a legitimate non-pretextual basis for its decisions is more

squarely addressed in determining whether Defendants have rebutted Plaintiff's prima facie case.[20]

### 2.    SF-50

Plaintiff alleges that Cheng changed his SF-50 job title and classification without authorization on July 21, 2021.  Compl. ¶ 22.  Cheng denies that she ever changed Plaintiff's SF-50.  Cheng Decl. ¶ 8.  The SF-50s in evidence for the period surrounding July 21, 2021 show Plaintiff's title as Financial Management Specialist, which is unchanged since November 24, 2019.  Dkt. No. 61-9, at 14–28.  Plaintiff has not created a triable issue of fact on whether Cheng

---

[20] Because the change in title here was accompanied by a change in responsibilities, the Court need not consider whether a change in title alone would constitute a materially adverse action. The Second Circuit has repeatedly quoted a formulation originally from the Seventh Circuit listing "a less distinguished title" as an example of a materially adverse change, but does not appear to have squarely addressed a case that involved only a change in title.  *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993)); *see, e.g.*, *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008).

However, a change from a managerial to non-managerial title alone could plausibly be considered an adverse action. Title VII "protects protects individuals from actions injurious to . . . the ability to secure future employment," which may include reputational injury. *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997); *see Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990) (negative communications about the employee with prospective employer satisfy the adverse action requirements); *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 391–92 (S.D.N.Y. 2019) ("[T]he Second Circuit and courts in this district have concluded that an employer's refusal to provide a letter of reference for a former employee constitutes an adverse employment action."). Analogously, a change to a less prestigious title may result in a loss of prestige and send a negative signal to future employers. *See Burlington*, 548 U.S. at 71–72 (holding that reassignment was adverse in part because the former position "required more qualifications, which is an indicator of prestige").  On the other hand, some courts have emphasized that a materially adverse action should be "tangible" rather than "purely subjective," suggesting that "loss of reputation" falls in the latter category unless accompanied by material consequences.  *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006); *see Douglas v. Donovan*, 559 F.3d 549, 552–55 (D.C. Cir. 2009); *Eady v. Veolia Transp. Servs., Inc.*, 609 F. Supp. 2d 540 (D.S.C. 2009) (holding that refusal to change an employee's job title from "Director of Operations" to "AGM/Director of Operations" was not materially adverse).

changed his SF-50 in July 2021, because he offers only "mere assertions" that this occurred. *Gottlieb v. Cnty. of Orange*, 84 F.3d at 518.[21]

### D.    Causation

Defendants argue that even assuming the rest of the prima facie case is satisfied, all of Plaintiff's claims fail on the final element, causation. Defendants contend that Plaintiff has not presented any direct evidence of causation, relevant decision-makers were not even aware of the protected activities for much of the relevant time period, and almost all of the adverse actions come too long after Bamba's protected activities to support an inference of causation. Dkt. No. 49 at 21. Although Cheng's four-day suspension proposal came within two months of Bamba's filing of an EEOC complaint, Defendants argue that any inference of causation is defeated by Bamba's refusal to follow Cheng's instructions regarding his email signature and work phone in the intervening time period. *Id.* at 21–22. Plaintiff notes that the initial letter of reprimand came within six weeks of Bamba's informal EEOC complaint, supporting an inference of causation. Dkt. No. 66 at 13. He also argues that after he filed his lawsuit in September 2019 and was away on detail until October 2020, Cheng and Sooter retaliated against him "at the earliest time possible." Dkt. No. 66 at 13.

"A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other

---

[21] Defendants suggest that Plaintiff's argument is in fact that Cheng changed Plaintiff's *position description* on the relevant date. Dkt. No. 70 at 2, citing Dkt. No. 66-14. Plaintiff has maintained throughout this case, both pro se and through counsel, that the issue is his SF-50. Compl. ¶ 22; Dkt. No. 66-27 ¶ 28; Dkt. No. 67 ¶ 7; Dkt. No. 66 at 7. Even assuming that his papers can be construed to reference a change in his position description, Plaintiff has not provided any evidence that the new position description was materially less desirable, as opposed to a simple "alteration of job responsibilities." *Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023). The new and old position descriptions refer to the same title, occupational code, and grade, and any differences in the duties described do not appear to be significant. *Compare* Dkt. No. 66-14 *with* Dkt. No. 61-8.

circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Littlejohn v. City of N.Y.*, 795 F.3d 297, 319 (2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  Because Plaintiff does not present direct evidence of retaliatory animus, only the standard for indirect proof of causation is relevant here.

        "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Vega*, 801 F.3d at 90; *see Kwan*, 737 F.3d at 845 ("[T]he but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity.").  However, recent Second Circuit decisions have stated that temporal proximity alone is "generally insufficient to establish causation 'after about three months.'" *Massaro*, 2022 WL 1788203, at *2 (quoting *Berrie v. Bd. of Educ. of Port Chester-Rye Union Free Sch. Dist.*, 750 F. App'x 41, 49 (2d Cir. 2018)).  Some cases have suggested that even two months is too long.  *See Dodd v. City Univ. of N.Y.* 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020) ("Generally, to show causation through temporal proximity alone, courts in this Circuit require no more than two months to have passed between a protected activity and an adverse action").  Although generally a gap of more than two to three months will therefore defeat an inference of causation, this is not a bright-line rule.  *See e..g.*, *Gorzynski*, 596 F.3d at 110–111 (holding that causation could be inferred despite a five-month gap).  Ultimately, a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).  A number of factors can influence the inference of causation.

        Causation may be inferred from a longer gap when there is evidence that the "adverse

action occurred at the first actual opportunity to retaliate." *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013).  For example, when a football manager made a complaint at the end of the fall season and retaliation occurred at the start of the spring season, causation could be inferred because the manager was "not directly working for [the football staff] over the intervening months," depriving them of the opportunity to retaliate.  *Id.*  Similarly, when the alleged adverse action was the beating of an incarcerated person by corrections staff, causation could be inferred despite a lapse of six months between complaint and retaliation because it "is plausible that the officers waited to exact their retaliation at an opportune time—as when [the plaintiff] was involved in a fight with another inmate—in order to have a ready explanation for any injuries suffered."  *Espinal*, 558 F.3d at 129.

On the other hand, even a short gap between protected activity and adverse may not support an inference of causation if another event presents a more obvious cause.  When a process of discipline or adverse action begins before the protected activity and only ends after the protected activity, an inference that the protected activity caused the adverse action generally cannot be supported.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87 (2d Cir. 2001), as amended (June 6, 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 581 (S.D.N.Y. 2010) (collecting cases).  Absent evidence to the contrary, the logical inference in this situation is that the pre-existing process would have resulted in the same adverse action even if the protected activity had not occurred.

In some instances, courts have held that an inference of causation from proximity may be defeated by an intervening event occurring after the protected activity.  *See Soto v. Marist Coll*., 2019 WL 2371713, at *11 (S.D.N.Y. June 5, 2019) (collecting cases).  This may happen when an adverse disciplinary response from the employer is so clearly connected to intervening misconduct that it would be unreasonable to infer that the discipline was caused by the prior protected activity.  *See Gubitosi*, 154 F.3d at 33 (when officer was fired after numerous disciplinary charges related to failing to search a prisoner who eventually was found to have contraband, temporal proximity was not sufficient to support an inference that she was fired because of a prior complaint about police practices); *Freeman v. Ace Tel. Ass'n*., 467 F.3d 695, 698 (8th Cir. 2006) (when board member was terminated after admitting to extensive acts of misconduct and dishonesty, temporal proximity was not sufficient to support an inference that he was fired for reporting an illegal payment).  However, evidence of an intervening event will only defeat a plaintiff's prima facie showing when it places the issue of causation entirely beyond genuine dispute.  *See Gubitosi*, 154 F.3d at 33 (describing the "significant intervening events" as "simply impossible to miss").  Given the court's responsibility to "construe facts in the light most favorably to the non-moving party," the mere existence of two possible explanations for an adverse action will not defeat a motion for summary judgment.  *Holcomb v. Iona Coll.*, 521 F.3d at 132.  If the plaintiff's evidence makes a "de minimis" showing on causation, the employer's evidence of an alternative legitimate explanation is considered at step two of the *McDonnell Douglas* analysis.[22]

---

[22] Some decisions suggest that an employee's prima facie case of causation is defeated more easily by intervening events.  *See, e..g.*, *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 222 (E.D.N.Y. 2018) ("While a Plaintiff may use temporal proximity to establish causation, he or she may only do so if there are no other allegations that otherwise undercut but-for causation.");

Finally, "lack of knowledge on the part of particular agents who carried out the adverse action is evidence of lack of causal connection." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011). However, when lack of knowledge is based on "individual agents' claims of unawareness . . . a jury is entitled to disregard such claims if they are unreliable." *Id.* In addition, a plaintiff may counter an individual's lack of knowledge by producing "evidence that the decision-maker was acting on orders or encouragement of a superior who did have the requisite knowledge." *Id.* A plaintiff may establish the element of causation via temporal proximity without showing that relevant decision-makers were aware of the protected activity. *Kwan*, 737 F.3d at 844–45 & n.4.

These principles must be applied to each of the adverse actions of which Plaintiff complains.

### 1. October 2020 Actions: Job Title and FFMS Access

Plaintiff argues that the October 2020 adverse actions were retaliation for the lawsuit he filed in September 2019. Dkt. No. 66-27 ¶ 16. The gap between the filing of the lawsuit and the adverse actions was over one year, which normally would be much too long to infer causation. *See Massaro*, 2022 WL 1788203, at *2; *Gorzynski*, 596 F.3d at 110–11.

---

*Dortch v. N.Y. City Dep't of Educ.*, 2016 WL 2621076, at *8–9 (E.D.N.Y. Mar. 23, 2016) ("[A]n 'anonymous complaint filed against plaintiff constitutes an intervening event that defeats any inference of causation.'") (quoting *Anderson v. National Grid, PLC*, 93 F.Supp.3d 120, 147 (E.D.N.Y.2015)). However, the court's duty on the prima facie case is merely to consider "whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks*, 593 F.3d at 164. When the plaintiff produces evidence that would normally suffice to infer causation and the employer provides an alternative explanation, considering whether the alternative evidence overcomes the plaintiff's proffered evidence is akin to the court's duty at steps two and three of the *McDonnell Douglas* analysis. *See, e.g.*, *Hahn v. Bank of Am. Inc.*, 2014 WL 1285421, at *19–21 (S.D.N.Y. Mar. 31, 2014), *aff'd sub nom. Hahn v. Bank of Am. N.A.*, 607 F. App'x 55 (2d Cir. 2015) (analysis of causation largely duplicative of analysis of employer's legitimate, non-retaliatory reasons); *Joseph v. Marco Polo Network, Inc.*, 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010) (same).

However, the temporal gap here is not as long as it seems. Although Bamba's access was not finally changed until his return from detail in October 2020, Cheng states that she began her efforts to change Bamba's access to the FFMS system much earlier: "[f]ollowing [her] entry into [her] role as Mr. Bamba's supervisor," which occurred on February 3, 2019. Cheng Decl. ¶ 6; Dkt. No. 66-27 ¶ 14; *see Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011) ("Events leading up to a formal decision will, in many situations, be relevant to the analysis of causation"). Bamba's initial EEOC complaint was filed in February 2019. Dkt. No. 66-27 ¶ 15. Cheng's statement that she "began the process to correct the issue" "[f]ollowing [her] entry into [her] role as Mr. Bamba's supervisor" does not clarify whether she began this process before or after Plaintiff's initial EEOC complaint. Cheng Decl. ¶ 6. Pending further factual development, Defendants have not ruled out the possibility that Plaintiff's EEOC complaint was "followed closely in time," by Cheng's initial efforts to change Plaintiff's FFS access. *Vega* 801 F.3d at 90.

As to the title, Sooter told Cheng to look into Bamba's title usage "[s]ometime while Mr. Bamba was on his detail." Sooter Decl. ¶ 7. Construed in the light most favorable to Plaintiff, this could have been as early as January 2020. This is still outside the two to three month window in which causation can be inferred from proximity to the September 2019 filing of the lawsuit. *See Massaro*, 2022 WL 1788203 at *2. However, Plaintiff alleges that Defendant was not served in the case until January 2020. Dkt. No. 66-27 ¶ 17. Because the decisionmaker may not retaliate based on protected activity he was not aware of, the date of service is more relevant than the date of filing. *See Clark County Sch. Dist.,* 532 U.S. at 272 (holding that causation could not be shown when lawsuit was filed before the adverse action, but the employer was only served with it after the adverse action); *Nagle*, 663 F.3d at 111 (basing causation analysis on the date the relevant decision maker became aware of the employee's protected report). Court

records show that service did occur in January 2020 as to Defendant Chad Wolf, in his capacity as Acting Secretary of DHS, Dkt. No. 8, 19-cv-8646, but that Defendant DHS was not served until October 16, 2019.  Dkt. No. 6, 19-cv-8646.  October 16 is still later than September, and approaches the two to three month window to infer causation for an adverse action occurring in January 2020.  Moreover, the fact that Plaintiff went on detail to a different region in January 2020 strengthens the inference of causation because it creates the possibility that Sooter was waiting for "an opportune time" to address Plaintiff's title.  *Espinal*, 558 F.3d at 129.  Although the inference is not powerful, it is possible that the lawsuit spurred Sooter to crack down on Bamba's unofficial title usage, but he waited to do so until Bamba was away because he wanted to avoid immediate conflict or believed the change would go over better if included as part of a set of changes upon Bamba's return to Region Two.

The version of the facts most favorable to the Plaintiff is that Cheng "began the process" to change Plaintiff's FFMS permissions shortly after Plaintiff's filing of his initial EEOC complaint.  Cheng Decl. ¶ 6.  Subsequently, a few months after Plaintiff filed and served his lawsuit, Sooter began the process of changing his title.  Measuring based on the start of each process, the temporal proximity is close enough to infer causation in the absence of direct evidence.  Bamba has made a prima facie case that as he continued to press his Title VII claims, DHS officials reacted by attempting to limit his privileges.  Although Sooter and Cheng deny that they were aware of the Plaintiff's complaints at the relevant times, a jury would be entitled to disbelieve these claims.  *Papelino*, 633 F.3d at 92.

### 2.  Letter of Reprimand

Cheng issued the Letter of Reprimand on December 1, 2020.  Dkt. No. 61-4.  Bamba argues that this was retaliation for the informal complaint he filed on October 26, 2020, alleging that Cheng and Sooter retaliated against him in violation of Title VII.  Dkt. No. 66 at 13; *see* Dkt.

No. 66-17.  Because the adverse action is less than two months after the protected activity, causation can be inferred from proximity alone in the absence of evidence to the contrary. *Massaro*, 2022 WL 1788203 at *2.

Although Defendant argues that Bamba has not shown Cheng was aware of the informal complaint, Dkt. No. 70 at 5, evidence of awareness is not required to infer causation from temporal proximity.  *Kwan*, 727 F.3d at 844–45 & n.4.  A jury need not credit Cheng's disclaimer of awareness.  *Papelino*, 633 F.3d at 92.  This is especially true because Plaintiff produces some evidence suggesting that Cheng could have been aware of the complaint, namely that the counselor's report lists her name and contact information under the heading "Counselor's Inquiry" and states that "the Aggrieved participated in ADR/Mediation."  Dkt. No. 66-17 at 3–4.

Defendant additionally argues that intervening events defeat the inference of causation. Dkt. No. 70 at 5.  Specifically, the LOR could not have been caused by the protected activity because it was clearly caused by Bamba's refusal to follow instructions.  *Id.*  However, this argument invites the Court to construe the facts in the light most favorable to Defendants.  The Defendants' alternative causal explanation is plausible, but is not "simply impossible to miss" such that Plaintiff cannot carry his de minimis burden to show causation.  *Gubitosi*, 154 F. 3d at 33.  Plaintiff carries this burden here by showing temporal proximity.  Whether the inference of causation from proximity can overcome the employer's plausible alternative explanation is considered later in the *McDonnell Douglas* analysis.

### 3.    Four-Day Suspension

Cheng issued Bamba a "Notice of Proposal to Suspend [for] 4 Days," on February 3, 2021.  Cheng Decl. ¶ 16; Dkt. No. 61-5.  Plaintiff was then suspended for four days without pay

by Sooter in March 2021.  Dkt. No. 61-11.  The nearest protected activity to these events is the

formal EEO complaint filed on December 29, 2020.  Dkt. No. 61-27.

Plaintiff does not dispute that Cheng's action was taken fewer than two months after a

protected activity, such that causation could normally be inferred from temporal proximity.  Dkt.

No. 49 at 21, citing *Dodd v. CUNY*, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020).  However,

Defendants again argues that the undisputed facts show that Plaintiff was disciplined because of

his failure to follow instructions.  *Id.*  This again requires analysis of whether the reason for

discipline was legitimate or a pretext, and is therefore best considered at *McDonnell Douglas*

steps two and three.  Moreover, Defendants' argument only has force to the extent that the

suspension was based on Bamba's failure to follow instructions regarding his cell phone on

January 11, 2021.  To the extent that the suspension was based on Bamba's failure to change his

title in his email signature after the LOR, this behavior had been ongoing since the LOR was

issued on December 1, 2020 and does not explain why Cheng took action at this particular time.

Plaintiff has made out a prima facie cause of causation based on temporal proximity.

### 4.    SF-50 and 14-Day Suspension

As described above, Plaintiff's allegations that Cheng changed his SF-50 on July 21,

2021 are unsupported by the evidence.  In any event, any adverse action occurring on July 21,

2021 would be more than five months after Plaintiff's most recent protected activity, the

complaint of December 29, 2020.  This is too far to infer causation from temporal proximity, and

Plaintiff has not produced other evidence of causation.  *Massaro*, 2022 WL 1788203 at *2.

Similarly, Plaintiff's 14-day suspension in June 2022 is much too far from any protected

activity to infer causation from temporal proximity.  *Id.*  Plaintiff does not produce evidence to

the contrary, simply stating that the suspension "is only a continuation of Defendant's

retaliation."  Dkt. No. 66.  "[A] plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  *Holcomb*, 521 F.3d at 137.

*      *      *

In summary, Plaintiff's evidence makes out a prima facie case that he was retaliated against when Defendants changed his privileges and title in October 2020, issued the letter of reprimand in December 2020, and suspended him for four days in March 2020.  Plaintiff's allegations that Cheng changed his SF-50 are not supported by evidence.  Plaintiff has not made a prima facie showing that his 14-day suspension was caused by any protected activity.

## II.    Burden-Shifting Analysis

Assuming the plaintiff can establish a prima facie case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega*, 801 F.3d at 83.  At this point, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).  "[O]nce an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action."  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (internal citations and quotations omitted).  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

A plaintiff may show pretext by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Kwan*, 737 F.3d at 846.  The plaintiff's evidence must show not merely that retaliatory motives influenced the employer's decision, but that "the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.* at 846.  It is well-established in the

44

Second Circuit that "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage. *Id.*(citing *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir.2010)); *see Chen*, 805 F.3d at 72 ("We have long held that temporal proximity between a protected complaint and an adverse employment action is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext.") (internal quotations omitted).

Defendants argue that "the Government had legitimate, non-retaliatory reasons for taking all of the adverse actions alleged, and Bamba has not raised a genuine issue of pretext." Dkt. No. 70 at 7–9. Plaintiff responds that "Defendant's offer of non-retaliatory reasons are merely pretext to its retaliation against Plaintiff." Dkt. No. 66 at 14. Defendants meet their burden of providing legitimate, non-retaliatory reasons for each action, and Plaintiff does not offer sufficient evidence to show that these reasons are pretextual.

## A.    October 2020 Actions: Job Title and FFMS Access

Defendants produced evidence showing that Cheng's request that Plaintiff stop using the title "Regional Financial Manager" was motivated by the idea that this title "could create the incorrect impression with stakeholders or other employees that Mr. Bamba was in a managerial or supervisory role." Cheng Decl. ¶ 9; *see* Sooter Decl. ¶ 7–9. This is supported by documentary evidence showing that Plaintiff did not have a supervisory role and that his official title and position description did not include the term "manager." Dkt. Nos. 61-3, 61-8, 61-9. It is legitimate and non-retaliatory for an employer to directing an employee to use only his official title. As Defendants put it, use of an unofficial title can sow confusion and dissension and use of the official title clarifies the chain of command. *See Milione v. City Univ. of N.Y.*, 950 F. Supp. 2d 704, 712–13 (S.D.N.Y. 2013), *aff'd*, 567 F. App'x 38 (2d Cir. 2014) (showing that plaintiffs title was changed to "more accurately reflect [plaintiff's] research activities and hierarchical position" met the employer's burden). These interests are especially present in a context where a

new supervisor had recently been promoted above some of her former superiors. It is further legitimate for an employer to insist that every employee comply with the rules applicable to all employees and not exercise self-help and disregard those rules with which they disagree. In the workplace, generally it is the employer and the supervisor and not the employee or supervisee who sets the rules. *See El Sayed*, 627 F.3d at 933 (granting summary judgment when defendant did not dispute that his action "was grounds for termination under Hilton's employment policies"); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 365 (S.D.N.Y. 2006) (employer met its burden when the adverse action "was the result of a policy").

Defendants also show a legitimate reason for removing Plaintiff's FFMS access. Cheng states she took this action because that DHS policy and sound financial practices require that the person who creates a financial document not also be able to approve it. Cheng Decl. ¶ 6; *see* Dkt. No. 61-17; Dkt. No. 61-15 at 97. The documentary evidence supports this by showing that granting Plaintiff approval access in addition to his other roles would violate DHS policy. Dkt. No. 61-17; *see* Dkt. No. 61-18. Following a department policy intended to ensure financial security is a legitimate, non-retaliatory interest. *See Hill*, 467 F. Supp. 2d at 365.

Plaintiff has not proffered any evidence to show that Defendants' offered reasons were pretextual. Plaintiff asserts that in the past he was allowed to keep the relevant privileges when he was supervised by someone other than Cheng. Dkt. No. 66 at 14–15. However, that others may not previously have instructed Plaintiff to use his assigned title or directed him not to approve financial documents did not deprive Sooter of the prerogative to ask Cheng to tell Plaintiff not to use the title "manager" or deprive Cheng of the prerogative to limit Bamba's FFMS privileges. "A jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170

(2d Cir. 2001); *see E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994).  However, here "[t]he so-called inconsistencies Plaintiff highlights . . . are not actually inconsistencies." *Carr v. N.Y. City Transit Auth.*, 2022 WL 824367, at *11 (S.D.N.Y. Mar. 18, 2022), *aff'd*, 76 F.4th 172 (2d Cir. 2023).  Cheng consistently asked Plaintiff not to use the title "manager" and not to approve financial documents.  Plaintiff offers no evidence that Sooter and Cheng treated him differently than they treated any other employees.  There is no evidence that any other employee at his level was permitted to use the title "manager" or to approve financial documents. Plaintiff has not in any way disputed that the title or FFMS approval policies were not legitimate policies applied evenly across employees.  *See Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) ("A showing that similarly situated employees belonging to a different [protected] group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination.").  Indeed, there is no evidence supporting causation other than temporal proximity, and temporal proximity is "insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext."  *Chen*, 805 F.3d at 72.  Given Defendants' significant evidence of legitimate, non-retaliatory reasons, the mere fact that Cheng and Sooter changed Plaintiff's privileges cannot "support[] a sufficient rational inference of discrimination."  *Weinstock*, F.3d at 42.  Plaintiff alleges that Cheng and Sooter knew of Bamba's EEO activity before they removed his privileges, Dkt. No. 67 ¶ 63–64.  But the only evidence he cites to support that proposition establishes at most that Cheng and Sooter were aware of Plaintiff's complaint about his loss of approval privileges *after* he lost those privileges.[23]  *See Gottlieb*, 84 F.3d at 518.

---

[23] Plaintiff cites to "Ex 11," which is the report of his informal complaint filed on October 26, 2020, which was based largely on the changes to his title and FFMS access.  Dkt. No. 66-17.

Plaintiff emphasizes another purported "contradiction[] in the employer's proffered legitimate, nonretaliatory reasons." *Kwan*, 737 F.3d at 846. He notes that Cheng told Plaintiff to use the title "Financial Program Cost Analyst" rather than the title on his SF-50 at that time, "Financial Management Specialist." Dkt. No. 66 at 14–15; Dkt. No. 67 ¶¶ 27–28. It is correct that there is a conflict between these two documents. *See* Dkt. No. 49 at n.5. Cheng's instruction cites "current Position Description and . . . PWP" as the source of Plaintiff's official title, Dkt. No. 61-1, and no evidence has been introduced as to whether the SF-50 or Position Description controls. However, the discrepancy does not support an inference of pretext. Even if Cheng chose between the two official titles and chose the one which sounded less managerial, this is consistent with the explanation that she and Sooter wanted to avoid the "incorrect impression with stakeholders or other employees that Mr. Bamba was in a managerial or supervisory role." Cheng Decl. ¶ 9; *see* Sooter Decl. ¶¶ 7–9.

### B. Letter of Reprimand and Suspensions

Defendants state that the LOR and subsequent suspensions were all related to the employer's legitimate interest in addressing "insubordination and misconduct." Dkt. No. 49 at 23 (quoting *Hill*, 467 F. Supp. 2d at 365). That argument is well-founded. An employer has an obvious and legitimate interest in addressing employee misconduct. *See Owens v. N.Y. City Hous. Auth.*, 934 F.2d 405 (2d Cir. 1991) ("[M]isconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee."); *Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir. 2000) (holding that "difficulty following instruction" and "outright insubordination" are

---

Even assuming that the inclusion of Cheng and Sooter's information in this document shows they were informed of Bamba's complaint *about* his loss of privileges, it does not show that they had knowledge of other complaints *prior* to his loss of privileges.

legitimate, nondiscriminatory business reasons to discharge an employee); *Baur v. Rosenberg, Minc, Falkoff & Wolff*, 2008 WL 5110976, at *4 (S.D.N.Y. Dec. 2, 2008) (collecting cases).

In addition, Plaintiff here mostly concedes the underlying insubordination or misconduct related to the LOR and suspensions.[24] As to the LOR, it is undisputed that after Cheng instructed Bamba to stop using his title, Bamba "continued to work with his title." Dkt. No. 67 ¶ 30. It is also undisputed that Bamba did not follow Cheng's repeated requests to send him a file for review. Dkt. No. 67 ¶ 31; *see* Dkt. Nos. 61-20, 61-4. Regardless of Bamba's view of the merits of that instruction, he did not have the right to disregard the instruction of his supervisor. As to the four-day suspension, it is similarly undisputed that Bamba continued to use the title "Regional Financial Manager" after the LOR and notwithstanding the direction he cease to use that title. Dkt. No. 61-10. Bamba does dispute that he failed to provide Cheng a clear response regarding whether her number was listed in his blocked contacts, the second ground for suspension. Dkt. No. 67 ¶ 34-35; *see* Dkt. No. 61-21. As to the 14-day suspension, Bamba does not concede that he behaved disruptively in the meeting. Dkt. No. 67 ¶ 47. However, he concedes that he accused Cheng of "intimidation and harassment," and the affidavits of six FPS

---

[24] Plaintiff disputes extensively whether Cheng, Sooter, or McCormick had authority to reprimand or suspend him. Dkt. No. 67 ¶ 33. Plaintiff states that his "first-line supervisor has been Federal Protective Service Directorate of Operations" and that his supervisors are "FPS Operations and Immediate Office of Secretary" as indicated in his SF-50. Dkt. No. 67 ¶¶ 3, 37. However, these entries in the SF-50 are under the heading "Name and Location of the Position's Organization," not "supervisor." Dkt. No. 66-22. The Directorate of Operations is an entire division of FPS, and Plaintiff's position being within that section is consistent with Cheng, Sooter, and McCormick being his chain of command. The evidence uniformly suggests Bamba's chain of command includes Cheng, Sooter, and McCormick. Cheng Decl. ¶ 4, Sooter Decl. ¶ 9, Dkt. No. 55 at 4. For Plaintiff to be correct it would need to be true that although he interacts regularly with people at work who state they are his supervisors, he in fact has a separate official chain of command. He has provided no evidence to that effect.

employees in attendance at the meeting uniformly state that Bamba was argumentative and caused a significant disruption.  Dkt. Nos. 52, 54, 56, 57, 58. 59.

Although Plaintiff disputes some of the underlying facts regarding his two suspensions, "the issue to be proven in a discrimination case is whether there was an improper motive for the employment decision—not whether any conduct relied upon by the employer actually occurred." *Oluyomi v. Napolitano*, 811 F. Supp. 2d 926 (S.D.N.Y. 2011), *aff'd,* 481 F. App'x 693 (2d Cir. 2012).  The Court does "not sit as a super-personnel department that reexamines an entity's business decisions."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir.1997).  Therefore, the issue is not whether the misconduct actually occurred but whether the perceived misconduct "is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground."  *Forrester v. Rauland–Borg Corp.,* 453 F.3d 416, 417 (7th Cir.2006); *see Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 496 (D.C. Cir. 2008) ("[T]he question is not whether the underlying sexual harassment incident occurred; rather, the issue is whether the employer honestly and reasonably believed that the underlying sexual harassment incident occurred.").

Plaintiff provides no basis to believe that the allegations of misconduct were a pretext for him to be disciplined for his protected activity.  As to the LOR, he concedes that he disobeyed Cheng's instructions in two different ways.  *See Oluyomi v. Napolitano*, 811 F. Supp. 2d 926, 949 (S.D.N.Y. 2011) (legitimate reason shown where plaintiff failed to follow supervisor's instructions); *Cherry v. Potter*, 709 F. Supp. 2d 213, 216 (S.D.N.Y. 2010) (failure to follow supervisor's instructions is a legitimate non-discriminatory reason for employment action).  A letter of reprimand for such activity is within the suggested range for such behavior in the agency's disciplinary code, and the letter thoroughly explains the basis for the reprimand. Dkt.

No. 61-14 at 14; Dkt. No. 61-4.  Other than proximity to a protected activity, Plaintiff provides

no reason to believe that the discipline was not caused by his misconduct.  *Chen*, 805 F.3d at 72.

  As to each of the subsequent suspensions, there is also no evidence of an improper

motive.  Each suspension was initially recommended by Cheng, but was not finally levied by

her.  Rather, it was decided "by an official with no interest in the outcome," a higher-ranking

supervisor who was less involved with Bamba's complaints.  *Hill*, 467 F. Supp. 2d at 365.  As to

the four-day suspension, Sooter received not only Cheng's explanation of the events but also the

LOR and four sets of emails demonstrating Bamba's allegedly insubordinate behavior.  Dkt. No.

66-16 at 4.  Bamba was permitted to respond to the proposal with the assistance of counsel, and

did respond with the assistance of a union representative.  *Id.*; Dkt. No. 61-10.  Sooter's reasoned

decision states that it considered all the submitted materials and specifically addresses the

arguments in Bamba's submission.  Dkt. No. 66-15.

  As to the 14-day suspension, it is notable that before recommending suspension Cheng

reached out to, and consulted heavily with, Employee and Labor Relationship Specialist William

Beckham.  Dkt. No. 67 ¶ 48; Beckham Decl. ¶ 4.  Beckham, who was not even an FPS employee

but rather a contractor, significantly shaped the subsequent disciplinary process.  Beckham Decl.

¶¶ 1, 4–6.  It was he, not Cheng, who collected statements from the other employees.  *Id.* ¶ 4.

Beckham also reports that he assisted Cheng in drafting the proposal and that he himself noted

Bamba's prior disciplinary history as an aggravating factor.  *Id.* ¶ 5.  If this was retaliatory

discipline simply aimed at punishing Bamba for his protected activity, it does not make sense

that Cheng and the agency would so heavily rely on an outsider with no vested interest.

  McCormick, who made the final suspension decision, was himself disinterested.  Before

he made the suspension decision, he received Cheng's suspension proposal along with six

statements of other employees, Cheng's own factual statement, the meeting minutes, and two other pieces of documentary evidence relevant to his decision. Dkt. No. 61-6 at 8. Bamba was permitted to respond with the assistance of counsel, and he did so. Dkt. No. 66-9 at 2–3. McCormick also involved Beckham in drafting his decision. Beckham Decl. ¶ 6. McCormick's decision explained the reasons for suspension and specifically addressed Bamba's counterarguments. Dkt. No. 66-9 at 3. Both suspensions were based on a disciplinary policy and were within, indeed perhaps below, the range of penalties that could have been sought under that policy. *See* Dkt. No. 61-14 at 14 (listing a penalty of "15-day suspension to removal" for a second or greater instance of "[w]illful or intentional delay or refusal to comply with an order . . .of a supervisor or other management official"). These extensive procedures suggest that even if the suspensions did not correctly characterize Bamba's misconduct, they were aimed at doing so rather than at pretextual punishment.

Plaintiff implies to some extent that the system was coopted, stating that "Sooter issued his decision at the behest of Cheng," "McCormick relied on Cheng's proposal," and "Beckham's contribution was entirely lead by Cheng's retaliatory motive." Dkt. No. 67 ¶¶ 39–40, 49, 59–62. These accusations sound in the "cat's paw" theory of liability, in which "an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (quoting *Cook v. IPC Intern. Corp.*, 673 F.3d 625, 628 (7th Cir. 2012)). An employee may prove a Title VII retaliation claim against an employer on this theory by showing that the subordinate had a retaliatory motive and the supervisor "negligently gave effect to [the subordinate's] retaliatory animus." *Id.* at 275–76.

The cat's paw theory does not give rise to a triable issue of fact here. It is true that Cheng initiated the disciplinary process, and parts of the relevant supervisor decisions copy the language from her suspension proposals. *See* Dkt. No. 66-9 at 5–6. However, Plaintiff has not made the threshold showing that Cheng's motives were retaliatory rather than based on his misconduct. Moreover, the careful process described above undermines any suggestion that the supervisors and Beckham were negligent. In fact, Beckham's involvement in the suspension process is highly inconsistent with the cat's paw theory. Beckham was a contractor who was entirely uninvolved with any of Bamba's underlying complaints and gained personal knowledge of the facts underlying the 14-day suspension by collecting statements from DHS employees. Beckham Decl. ¶¶ 1, 5. Bamba does not explain how Beckham could have been co-opted by Cheng or why he would have pursued a retaliatory suspension. More generally, while Bamba offers only conclusory statements that the supervisors' actions were taken "on behest of Cheng," the decisions reflect that each supervisor did review and consider the underlying materials. Dkt. No. 67 ¶¶ 39–40; Dkt. No. 66–15; Dkt. No. 66-9. Although certain portions of the suspension decisions copy Cheng's language, other portions, especially the portions addressing Bamba's counterarguments, are entirely original to the supervisors and show consideration of Bamba's claims. *Compare* Dkt. No. 61-5 *with* Dkt. No. 61-11; Dkt. No. 61-1 *with* Dkt. No. 66-9. This is not a case where the supervisor credited one set of accusations "to the exclusion of all other evidence" and "declined to examine contrary evidence" tendered by the accused. *Vasquez*, 835 F.3d at 275.

Plaintiff continued to use the "Regional Financial Manager" title for over a month after his supervisor had instructed him to stop and officially reprimanded him for not doing so. Even putting aside the additional disputed allegations, progressively increasing discipline would be

expected.  Similarly, Plaintiff told his supervisor in a large meeting that her behavior was intimidation and harassment, and numerous employees gave statements that Plaintiff was "yelling and interrupting" "disrespectful," "continued to interrupt multiple times," and similar phrases.  Dkt. No. 61-6 at 23, 27, 32.  Regardless of whether Plaintiff had engaged in protected activity at some point in the past, this would normally result in punishment.  Plaintiff has not provided evidence to support the contrary inference that but-for the protected activity, he would not have faced suspension.

*       *       *

Defendants have met their burden of showing a legitimate, non-retaliatory explanation for each action, and Plaintiff has not shown that any of these explanations are a mere pretext. Therefore, summary judgment must be granted for Defendants even on those claims for which Plaintiff has made out a prima facie case.

**CONCLUSION**

The motion to dismiss the claims of retaliation under is 42 U.S.C. § 1981 is GRANTED, and the motion for summary judgment with respect to all other claims is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 48, issue Judgment for Defendants consistent with this Opinion, and close the case.

SO ORDERED.

Dated: August 23, 2024
      New York, New York
                                            LEWIS J. LIMAN
                               United States District Judge